In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2815

ALAN BRAID,

*Plaintiff-Appellant,*

*v.*

OSCAR A. STILLEY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 1:21-cv-05283 — **Jorge L. Alonso,** *Judge.*

ARGUED APRIL 1, 2025 — DECIDED JULY 10, 2025

Before SYKES, *Chief Judge*, and SCUDDER and KIRSCH, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In September 2021 Dr. Alan Braid, a Texas OB/GYN, wrote an editorial in the *Washington Post* admitting he performed an abortion in violation of the Texas Heartbeat Act. Three individuals from three different states reacted by each invoking the citizen-suit enforcement provision of the Texas Heartbeat Act and seeking to recover at least $10,000 in statutory damages.

Now facing the prospect of duplicative liability, Dr. Braid made use of the federal interpleader statute, 28 U.S.C. § 1335, to join the claimants in a single suit. But, in an odd twist, he did not do so by going to any Texas federal court but instead by filing suit in federal court in Chicago. In addition to his interpleader claim, Dr. Braid sought declaratory relief, urging the district court to declare the Texas Heartbeat Act unconstitutional.

The district court dismissed Dr. Braid's entire suit, concluding that the existence of parallel state-court proceedings justified abstention under the Supreme Court's *Wilton-Brillhart* doctrine. Though we chart a different course of reasoning, we ultimately reach the same end point and therefore affirm the dismissal of Dr. Braid's federal case.

## I

### A

Texas enacted the Heartbeat Act, more commonly known as S.B. 8, in March 2021. The Act makes it unlawful for an individual to perform, or aid in performing, an abortion after the detection of a fetal heartbeat, which typically occurs around six weeks' gestation. See Tex. Health & Safety Code § 171.204(a); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 58 (2021) (Roberts, C.J., concurring in the judgment in part and dissenting in part).

The law has several uncommon elements, chief among them its citizen-suit enforcement provision, which the Texas legislature designed to "shield" the "law from judicial review." *Jackson*, 595 U.S. at 59. S.B. 8's enforcement scheme is novel, divesting state officials of all enforcement authority and, instead, empowering private enforcement. The Act

authorizes civil actions in state court by private individuals who, if successful in proving a statutory violation, may recover a minimum $10,000 in statutory damages, plus costs and fees, from the individual who performed the unlawful abortion. See Tex. Health & Safety Code § 171.208(a), (b)(2)–(3). The cost and fee provision does not work both directions, however. A prevailing defendant cannot recover their own costs incurred in defending the lawsuit. See *id.* § 171.208(i).

The Act also bars defendants from raising certain defenses, including that any aspect of S.B. 8 is unconstitutional (see *id.* § 171.208(e)(2)) or asserting non-mutual issue or claim preclusion (see *id.* § 171.208(e)(5)) if the defendant already prevailed in a separate lawsuit brought by another private "bounty hunter[]" plaintiff. *Jackson*, 595 U.S. at 62 (Sotomayor, J., concurring in the judgment in part and dissenting in part). If, however, a defendant provides proof of having "paid the full amount of statutory damages … in a previous action for that particular abortion," the court may not award relief to a second claimant. Tex. Health & Safety Code § 171.208(c).

B

Dr. Alan Braid is an OB/GYN licensed to practice in Texas. On September 18, 2021, the *Washington Post* published an editorial written by Dr. Braid in which he admitted to performing an abortion twelve days earlier (on September 6), in violation of S.B. 8. The response was immediate. Three individuals sued Dr. Braid in Texas state court pursuant to S.B. 8's citizen-suit provision: Felipe N. Gomez, Oscar Stilley, and Wolfgang P. Hirczy de Miño.

As the parties confirmed at oral argument, Stilley's lawsuit is the only one that remains pending. (Hirczy de Miño

voluntarily dismissed his suit without prejudice, and the Texas Court of Appeals affirmed a state trial court's dismissal of Gomez's suit for lack of standing.) Dr. Braid remains exposed to additional litigation and liability, however, including by non-parties to this suit, because the Act's four-year statute of limitations does not expire until September 6, 2025. See Tex. Health & Safety Code § 171.208(d).

After Gomez, Stilley, and Hirczy de Miño filed their lawsuits in Texas courts, Dr. Braid went on the offensive. In October 2021 he invoked 28 U.S.C. § 1335 and brought a federal interpleader action in Illinois federal court. Because Gomez, one of the interpleader defendants, lives in or around Chicago, the Northern District of Illinois offered an appropriate venue. See 28 U.S.C. § 1397. Along with his complaint, Dr. Braid deposited $10,000 with the district court—the minimum statutory damages recoverable under S.B. 8 and more than the $500 required by § 1335 to establish an interpleader fund.

In addition to his federal interpleader claim, Dr. Braid also sought declaratory relief, asking the district court to declare S.B. 8 unconstitutional under the First and Fourteenth Amendments.

C

In February 2022 Dr. Braid moved for summary judgment, contending that he did not owe *any* of the interpleader defendants statutory damages because S.B. 8 is unconstitutional, including, among other reasons, because it conflicts with *Roe v. Wade*, 410 U.S. 113 (1973). But while Dr. Braid's motion was pending, the Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, and overruled *Roe*. See 597 U.S. 215, 302 (2022). Dr. Braid acknowledged *Dobbs* as part of informing the

district court he still sought a declaration that S.B. 8's enforcement scheme violates his "due-process, equal-protection, and First Amendment rights."

In the interim, plaintiff Hirczy de Miño moved to dismiss Dr. Braid's complaint, and plaintiff Gomez urged the district court to abstain. The district court resolved these motions in a single order dismissing Dr. Braid's complaint.

The district court began by assuring itself of its jurisdiction, observing that "[t]his case is not the usual interpleader action." For one, the court explained, unlike most interpleader actions where multiple people lay claim to a "particular asset" or "identifiable fund," the interpleader defendants here press "a mere private right of action" against Dr. Braid's assets, not claiming entitlement to a pre-established fund. Even still, because Dr. Braid deposited $10,000 with the court's registry, the court determined that he "theoretically" established a fund sufficient to sustain an action in interpleader.

From there the district court questioned whether Dr. Braid has a "reasonable fear of double liability"—a condition necessary to establish Article III standing to sustain an interpleader action. See *Indianapolis Colts v. Mayor & City Council of Baltimore*, 741 F.2d 954, 957 (7th Cir. 1984) (*Indianapolis Colts II*) ("[T]he stakeholder must have a real and reasonable fear of double liability or vexatious, conflicting claims to justify interpleader."); *State Farm Life Ins. Co. v. Jonas*, 775 F.3d 867, 870 (7th Cir. 2014) (concluding no justiciable controversy existed where state law eliminated the risk that the interpleader plaintiff would face multiple liability).

The court turned next to S.B. 8's provision prohibiting any award of relief if the defendant demonstrates that he "previously paid the full amount of statutory damages" in a separate action. Tex. Health & Safety Code § 171.208(b)(2). While that provision, at first glance, might appear to foreclose double recovery, the district court observed that subsection (b)(2) hinges its protection on a defendant providing proof of payment, not merely proof of a separate preexisting judgment. So, the court concluded, S.B. 8 leaves open the possibility of duplicative and conflicting judgments, resulting in a justiciable interpleader claim.

But even though the district court determined it had jurisdiction to consider Dr. Braid's claims, it ultimately dismissed the case, exercising its discretion to abstain under the *Wilton-Brillhart* doctrine. See *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942). The court found no basis upon which it "could select among the three interpleader claimants," rendering it all but impossible to resolve Dr. Braid's interpleader claim. Abstention reflected the appropriate path forward, the court underscored, because it would allow Texas state courts to resolve the disposition of competing claims against Dr. Braid in the first instance.

This appeal followed. With each of the three appellee plaintiffs proceeding *pro se* on appeal, as they did below, we appointed Brian J. Paul of Faegre Drinker Briddle & Reath LLP as amicus curiae to defend the district court's decision.

## II

### A

We begin, as we must, by assessing whether Dr. Braid's suit falls within the "limited jurisdiction" conferred upon federal courts by Congress. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Dr. Braid invoked federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, the federal question jurisdiction statute. Section 1331 grants district courts original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States," including where "federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (quoting 28 U.S.C. § 1331).

Dr. Braid advanced multiple claims, seeking both interpleader and declaratory relief under 28 U.S.C. §§ 1335 and 2201, respectively. Because § 2201, or the Declaratory Judgment Act, "provides no independent source of federal subject-matter jurisdiction," it was Dr. Braid's federal interpleader claim which supplied the cause of action necessary to open the federal courthouse doors. *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). Before we assess the merits of Dr. Braid's complaint, then, we must assure ourselves that Dr. Braid's interpleader claim fits within the contours of 28 U.S.C. § 1335.

Like the district court, the parties, too, recognize that this case is far from an ordinary interpleader case which follows a similar and well-known pattern: "a neutral stakeholder, usually an insurance company or a bank," sues in federal court to force "all the claimants" to the policy or fund "to litigate their claims in a single action brought by the stakeholder."

*Indianapolis Colts v. Mayor & City Council of Baltimore*, 733 F.2d 484, 486 (7th Cir. 1984) (*Indianapolis Colts I*) (citing 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1701 (1972)). Congress originally limited our jurisdiction to this narrow set of claims, specifying that statutory interpleader applied only to actions brought by "any insurance company or fraternal beneficiary society." Act of Feb. 22, 1917, Pub. L. No. 64-346, ch. 113, 19 Stat. 929; see also Wright & Miller, *Federal Practice & Procedure* § 1701 (3d ed. 2025).

But over time Congress expanded the remedy's availability, amending the statute in 1936 to make interpleader available to "any person, firm, corporation, association, or society … under any obligation written or unwritten to the amount of $500 or more" to which two or more adverse and diverse claimants assert entitlement. Act of Jan. 20, 1936, Pub. L. No. 74-422, ch. 13, 49 Stat. 1096 (codified at 28 U.S.C. § 1335). This amendment also extended the jurisdiction of the federal courts to actions "in the nature of interpleader," thereby "relax[ing]" some of the remedy's common-law requirements, including "that the stakeholder be neutral and that the conflicting claims have the same origin." *Indianapolis Colts I*, 733 F.2d at 486; see also *Texas v. Florida*, 306 U.S. 398, 406–07 (1939) (explaining that the expansion of federal jurisdiction to suits "in the nature of interpleader" extends interpleader to plaintiffs who themselves "claim[] an interest in the property or fund which is subjected to the risk").

In today's iteration, § 1335 provides that "district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its

custody or possession money or property of the value of $500 or more," so long as:

> (1) Two or more adverse claimants, of diverse citizenship as defined in subsection (a) or (d) or section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court with respect to the subject matter of the controversy.

28 U.S.C. § 1335(a)(1)–(2).

From this text, courts have identified three prerequisites to the exercise of interpleader jurisdiction pursuant to § 1335: (1) an amount in controversy in excess of $500; (2) two or more adverse claimants of diverse citizenship; and (3) the deposit or conferral of a bond by the interpleader plaintiff sufficient to ensure compliance with a future order or judgment. 7 Wright & Miller, *Federal Practice & Procedure* § 1714 (3d ed. 2025) (collecting cases). It is against this backdrop that we consider whether Dr. Braid's suit meets these requirements,

thereby allowing us to consider his interpleader claim and accompanying claims for declaratory relief on the merits.

B

In defending the district court's decision, Mr. Paul, as amicus, contends that Dr. Braid's interpleader suit falls short in two ways: his liability has not yet been determined, so there is no set fund to discern or deposit with the district court, and, in any event, Dr. Braid failed to deposit the largest amount in controversy, rendering his $10,000 deposit insufficient. While these points have much to say for themselves, we conclude that neither presents a barrier to the district court's exercise of jurisdiction over Dr. Braid's interpleader action.

Start with the presence of a definite fund. Section 1335(a) requires that a plaintiff deposit with the court "such money or property" that "aris[es] by virtue of any such obligation." Courts have interpreted this language to require the existence of "a limited fund or some specific, identifiable property," such that the court can adjudicate an equitable division of the property and conclusively resolve competing claims. 7 Wright & Miller, *Federal Practice & Procedure* § 1704 (3d ed. 2025). But that does not mean interpleader confines itself to resolving entitlement to contested insurance funds or estate assets, though those fact patterns may remain the typical use of interpleader. See *id.* Remember that Congress drafted § 1335 to cover actions "in the nature of interpleader," 28 U.S.C. § 1335(a), rendering it fit to resolve "*any* protectable property interest" with the remedy "seldom … rendered inappropriate because of the nature of the stake," 7 Wright & Miller, *Federal Practice & Procedure* § 1704 (3d ed. 2025) (emphasis added).

Congress's expansion of § 1335 explains the application of interpleader to a variety of non-traditional contexts, including to resolve competing claims to reward money for an arrest and conviction of a robber, see *Davis v. Mathews*, 361 F.2d 899, 900 (4th Cir. 1966), the assignment of oil and gas leases, see *Guy v. Citizens Fid. Bank & Tr. Co.*, 429 F.2d 828, 829 (6th Cir. 1970), and funds recovered from a man who pleaded guilty to multiple bank robbery charges, see *United States v. Cent. Nat. Bank of Cleveland*, 429 F.2d 5, 6 (8th Cir. 1970).

Section 1335 is broad in another way: it extends relief to circumstances where multiple individuals claim entitlement to "such money or property" that "aris[es] by virtue of any such obligation." 28 U.S.C. § 1335. By its terms, then, the statute encompasses monetary obligations arising from a statutory violation. See generally Zechariah Chafee, Jr., *The Federal Interpleader Act of 1936* (pt. 1), 45 Yale L.J. 963, 972 (1936) (explaining, as the principal drafter of the modern federal interpleader statute, that the use of "obligation" in § 1335 is broad enough to encompass "tort obligations").

And although the exact and ultimate scope of Dr. Braid's liability has not yet been determined, we believe it is definite enough to establish a viable interpleader fund. S.B. 8 provides that private individuals may recover a minimum of $10,000 from any individual who violates the Act. After Dr. Braid took to the *Washington Post* to admit to performing an abortion in violation of S.B. 8, a predictable, if not invited, reaction followed: three individuals invoked S.B. 8, became claimants, and thereby sought to recover a singular fund—damages under S.B. 8—from Dr. Braid in the Texas state courts. So even though the monetary value of Dr. Braid's liability may be open-ended to some degree at this stage, a district court's

interpleader jurisdiction remains sound even where "claims against the stakeholder potentially exceed the value of the interpleaded fund." *Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.*, 918 F.2d 1065, 1069 (2d Cir. 1990).

This outcome makes sense considering Congress's expansion of interpleader to allow interested stakeholders to resort to the mechanism even while contesting their own liability. See *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 532 n.9 (1967) (acknowledging that the modern interpleader statute in § 1335 authorizes suits "'in the nature of interpleader,' … meaning those in which the plaintiff is not wholly disinterested"). Indeed, an interpleader plaintiff may challenge a successful claimant's recovery if "the amount awarded is more than the stakeholder's admitted liability." 7 Wright & Miller, *Federal Practice & Procedure* § 1714 (3d ed. 2025). It follows then that an interpleader plaintiff's liability does not need to be conclusively determined at the pleading stage to establish a definite interpleader fund.

Mr. Paul also contends that Dr. Braid's fund is jurisdictionally defective because one of the interpleader defendants, Oscar Stilley, sought to recover $100,000 in his Texas suit—an amount far greater than the $10,000 Dr. Braid deposited with the district court. While it is true that, "[a]s a general rule, the stakeholder must deposit or post a bond in the amount equal to the largest claim," *id.* § 1716, assessing an interpleader fund's sufficiency "is not a mechanical process under which the court uncritically searches for the highest amount claimed by the adverse claimants," *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 210 (3d Cir. 1999) (Alito, J.); but see *In re Sinking of M/V Ukola*, 806 F.2d 1, 5 (1st Cir. 1986) ("A court may not assert jurisdiction over an interpleader action where the

money, property or bond could not suffice to pay the largest amount in controversy."); *Acuity v. Rex, LLC*, 929 F.3d 995, 1101 (8th Cir. 2019) (explaining that the interpleader plaintiff must "deposit the amount claimed by [the claimant] or at the very least 'the largest amount for which it may be liable in view of the subject matter of the controversy'" (first citation omitted) (quoting *Asbestospray*, 182 F.3d at 210)).

The amount required instead "depends upon the person who invokes interpleader and what he asserts to be the subject matter of the controversy." *Asbestospray*, 182 F.3d at 210 (quoting *In re Sinking of M/V Ukola*, 806 F.2d at 5). And here it is the abortion Dr. Braid performed on September 6, 2021, that is the "subject matter of the controversy" for which multiple claimants seek to recover statutory damages under S.B. 8, though only one claimant will be able to do so at the expense of the others. See Tex. Health & Safety Code § 171.208(c). In this way, then, the $10,000 on deposit in the district court represents at least the minimum mandatory statutory damages under S.B. 8 to which the three Texas plaintiffs all claim equal entitlement. Put most simply, for Stilley to recover the $100,000 he seeks, he first needs to win out against the other two interpleader defendants to the $10,000 fund.

While the largest amount in controversy usually controls, a plaintiff need not deposit an amount which is "not realistically within the scope of the interpleader as pleaded." *Asbestospray*, 182 F.3d at 210. And here, on the facts presented by all parties, we see no reasonable basis to conclude that Oscar Stilley would ever recover the $100,000 he sought in his Texas complaint. He could have sought $1 million, as S.B. 8 imposes no statutory cap on damages. See Tex. Health & Safety Code § 171.208(b). Yet S.B. 8 does not automatically entitle a bounty

hunter plaintiff (like Stilley) to the damages he dares to request in an enforcement suit. Mr. Paul makes no argument to the contrary, acknowledging that there is no way to know whether (or on what basis) a Texas court would award more than the $10,000 provided by statute.

Although we ultimately reject Mr. Paul's contention that the district court lacked subject-matter jurisdiction to consider Dr. Braid's interpleader claim, his arguments by no means are makeweight. He is right that Dr. Braid's federal suit is an odd fit in a few different ways with the interpleader statute. But, at bottom, we see the requisite jurisdictional inquiry as one rooted in interpreting a statute Congress deliberately drafted in broad terms. Section 1335 establishes a federal cause of action which, by its terms, extends to cases where, as here, multiple individuals seek mandatory statutory damages recoverable by only one claimant. And Dr. Braid's interpleader action satisfies the statute's other demands. The district court, therefore, had subject-matter jurisdiction over Dr. Braid's interpleader action.

## III

### A

After determining it had jurisdiction over this dispute, the district court applied the *Wilton-Brillhart* abstention doctrine, a decision we review without deference. See *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714 (7th Cir. 2009).

Dr. Braid contends that the district court erred when it dismissed the case on abstention grounds and, more specifically, when it concluded that *Wilton-Brillhart* applied to govern statutory interpleader actions. In Dr. Braid's view, the Supreme Court has limited the doctrine's scope to actions brought

pursuant to the Declaratory Judgment Act, so the district court should have applied the more demanding *Colorado River* standard to abstain in favor of parallel state-court proceedings. Whether *Wilton-Brillhart* should apply to statutory interpleader actions is a difficult question and one which requires us to take a close look at Supreme Court case law on federal abstention against the backdrop of parallel state-court proceedings.

We start at the beginning with the Supreme Court's 1942 decision in *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, holding that a district court may exercise its discretion to abstain from a suit brought pursuant to the Declaratory Judgment Act in favor of parallel state-court proceedings, *id.* at 494. "Although the District Court had [diversity] jurisdiction" over the action in *Brillhart*, the Supreme Court explained, "it was under no compulsion to exercise that jurisdiction." *Id.* Rather, the court had discretion to abstain from resolving the federal action if it determined that "the questions in controversy between the parties to the federal suit … can better be settled in the proceeding in the state court." *Id.* at 495.

The Supreme Court encountered a similar fact pattern over three decades later, considering once again whether federal abstention was proper in favor of parallel state-court proceedings. This time, however, the Supreme Court proceeded differently and emphasized federal courts' *lack of* discretion in the face of their "virtually unflagging obligation … to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Confronted with a suit brought by the federal government seeking a resolution of its water rights, which were actively being litigated in state-court proceedings, the Supreme Court applied a far more

demanding test, declaring that "[a]bstention from the exercise
of federal jurisdiction is the exception, not the rule." *Id.* at 813.

In most cases, the Court observed, "the pendency of an ac-
tion in the state court is no bar to proceedings concerning the
same matter in the Federal court having jurisdiction," so
"[o]nly the clearest of justifications will warrant dismissal."
*Id.* at 817, 819 (quoting *McClellan v. Carland*, 217 U.S. 268, 282
(1910)). Before electing to abstain, then, district courts must
assess whether "exceptional" circumstances justify dismissal
"for reasons of wise judicial administration." *Id.* at 818. Such
circumstances existed in *Colorado River*, the Court determined,
because of "the inconvenience of the federal forum," "the de-
sirability of avoiding piecemeal litigation," as well as "the or-
der in which jurisdiction was obtained by the concurrent fo-
rums." *Id.* (citing *Brillhart*, 316 U.S. at 495). The Supreme
Court expanded the list of relevant considerations in subse-
quent cases to include whether "federal law provides the rule
of decision on the merits" and the potential "inadequacy of
the state-court proceeding to protect" the plaintiff's rights.
*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S.
1, 23, 26 (1983).

If our description of *Colorado River* seems in tension with
*Brillhart*, that is a fair reaction. See generally *Will v. Calvert Fire
Ins. Co.*, 437 U.S. 655, 667 (1978) (Blackmun, J., concurring in
the judgment) (expressing confusion over the plurality's de-
scription of *Brillhart* and *Colorado River* as "fully compatible"
with one another). Indeed, the circuits split on this precise ob-
servation—over whether *Brillhart* survived *Colorado River*
and, more specifically, over whether the exceptional circum-
stances test also applies to motions to abstain from Declara-
tory Judgment Act claims in the face of parallel state

litigation. Compare *Lumbermens Mut. Cas. Co. v. Conn. Bank & Tr. Co.*, 806 F.2d 411, 413–14 (2d Cir. 1986) (holding that the district court erred when it applied *Brillhart* abstention to a declaratory judgment action), with *Granite State Ins. Co. v. Tandy Corp.*, 986 F.2d 94, 95 (5th Cir. 1992) (explaining that the *Moses H. Cone* and *Colorado River* factors do not apply to declaratory judgment actions).

The Supreme Court resolved the split in its 1995 decision in *Wilton v. Seven Falls Co.*, 515 U.S. 279, clarifying that *Brillhart* abstention remained good law after *Colorado River*, *id.* at 289. "Distinct features of the Declaratory Judgment Act," the Court explained, "justify … vesting district courts with greater discretion in declaratory judgment actions than that permitted under the 'exceptional circumstances' test of *Colorado River*." *Id.* at 286. The most prominent of these "features," the Court recognized, is the Act's "textual commitment to discretion," providing that courts "*may* declare the rights … of any interested party seeking such declaration." *Id.* (emphasis added) (quoting 28 U.S.C. § 2201(a)). In that way, Congress "created an opportunity, rather than a duty," for federal courts to grant "a new form of relief," thereby reserving its exercise to the sound discretion of district courts. *Id.* at 288. And like *Colorado River*, *Brillhart* abstention roots itself in the recognition that the obligation of federal courts to exercise their jurisdiction may yield to "considerations of practicality and wise judicial administration." *Id.*

It is against these precedents that we are asked to resolve whether *Wilton-Brillhart* abstention extends to statutory interpleader actions where the district court exercises jurisdiction pursuant to § 1335.

B

The district court was not the first court to apply *Wilton-Brillhart* to abstain from an interpleader action. As the court recognized, the Third Circuit has held that *Wilton-Brillhart* (and not *Colorado River*) governs a district court's decision to abstain from a statutory interpleader action. See *NYLife Distribs., Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 382 (3d Cir. 1995). On the Third Circuit's reading, *Wilton* itself clarified that *Colorado River*'s "exceptional circumstances test is not universal," and may "yield" in those instances where district courts are exercising discretion conferred by statute. *Id.* at 379. And historically, the court continued, "interpleader is a suit in equity," so the operative question became whether "district courts retain their traditional equitable discretion" when exercising jurisdiction pursuant to § 1335. *Id.* at 380.

In answering this question in the affirmative, the Third Circuit relied on *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), where the Supreme Court held that a federal court's "equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command" from Congress, *id.* at 313 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). Examining § 1335 and its related statutory provisions, the Third Circuit found the text "inconclusive," so it "resolve[d] any ambiguities … in favor of that interpretation which preserves the courts' equitable discretion." *NYLife Distribs.*, 72 F.3d at 381. Interpleader's historic expansion provided further support for this conclusion, the Third Circuit reasoned, because Congress appeared "more interested in providing an opportunity for litigants to resolve disputes, than in creating a duty in the district courts to exercise the jurisdiction given them." *Id.* at 382.

A year later came the Supreme Court's decision in *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996), which could be read to lend support to the Third Circuit's conclusion. Although *Quackenbush* involved application of the *Burford* abstention doctrine—and not *Wilton-Brillhart* or *Colorado River*—the Court reinforced the relationship between abstention and the equitable discretion of federal courts. See *id.* at 717–18. In its discussion of abstention's historical roots, the Court emphasized that "it has long been established that a federal court has the authority to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a court of equity.'" *Id.* at 717 (quoting *Fair Assessment in Real Est. Ass'n v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring)). This discretion to decline the exercise of jurisdiction "extends to all cases in which the court has discretion to grant or deny relief." *Id.* at 718.

For our part, we have applied this same reasoning in the context before us here—statutory interpleader. In *Koehring Co. v. Hyde Construction Co.*, 424 F.2d 1200 (7th Cir. 1970), we affirmed a district court's exercise of its discretion to dismiss a statutory interpleader action "on grounds of equity and comity, when the interests of the stakeholder and all claimants will be adequately protected in a pending state court proceeding," *id.* at 1202.

Other circuits too have reached much the same conclusion in the wake of *Colorado River* and *Quackenbush*—that interpleader relief is grounded in equity, thereby committing its exercise, against the backdrop of parallel state-court proceedings, to the district court's discretion—though none reference the *Wilton-Brillhart* doctrine by name. See *Equitable Life Assurance Soc. of the U.S. v. Porter-Englehart*, 867 F.2d 79, 83 (1st Cir.

1989) ("agree[ing]" with the notion that "federal courts should dismiss interpleader actions when federal adjudication would disrupt ongoing state proceedings"); *Am. Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) (same); *Asbestospray*, 182 F.3d at 211 (same) (citing *NYLife Distribs.*, 72 F.3d at 381)); *Home Indem. Co. v. Moore*, 499 F.2d 1202, 1205 (8th Cir. 1974) (same); but see *Gold-Fogel v. Fogel*, 16 F.4th 790, 799 (11th Cir. 2021) (explaining that the court's own multi-factor test governing the application of *Wilton-Brillhart* abstention does not apply to a statutory interpleader claim because *Wilton-Brillhart* "relies on the permissive wording of the Declaratory Judgment Act"). This approach also accords with the generally accepted view that courts may "dismiss or stay an interpleader proceeding … if the disputed issues are likely to be resolved in [another] proceeding." 7 Wright & Miller, *Federal Practice & Procedure* § 1709 (3d ed. 2025).

To be sure, we also have case law pointing in the opposite direction, suggesting *Wilton-Brillhart*'s more limited scope. In *R.R. Street & Co. v. Vulcan Materials Co.*, 569 F.3d 711, we held that district courts may not apply the *Wilton-Brillhart* doctrine to dismiss claims "independent" from a plaintiff's claims for declaratory relief, meaning "they could stand alone in federal court—both jurisdictionally and substantively—irrespective of the declaratory claim," *id.* at 716. Courts must hear those independent non-declaratory claims, we explained, "subject to the presence of exceptional circumstances under the *Colorado River* doctrine." *Id.*

Dr. Braid contends that *R.R. Street* should control here. His claim for interpleader relief stands alone and distinct from his constitutional claims for declaratory relief, his argument goes, so *Wilton-Brillhart* does not apply to his interpleader claim.

But *R.R. Street* did not involve a claim for interpleader relief and did not otherwise purport to resolve whether *Wilton-Brillhart* governs a district court's decision to abstain from an action brought pursuant to § 1335 in favor of parallel state-court proceedings. See *id.* at 713–14. *R.R. Street*, in short, does not resolve the question presented here: is the district court's exercise of § 1335 interpleader power governed by the Supreme Court's more lenient *Wilton-Brillhart* standard, considering the inherent discretion of federal courts in exercising their powers of equity, or is *Wilton-Brillhart*, by its terms, limited solely to actions brought pursuant to the Declaratory Judgment Act?

This is a difficult question, but ultimately one we do not need to resolve because, in the final analysis, we would affirm the district court's decision to abstain under either the *Wilton-Brillhart* or *Colorado River* doctrines.

## C

We acknowledge that the parties did not brief how *Colorado River*'s exceptional circumstances test might apply to the facts of this case were we to agree with Dr. Braid that *Wilton-Brillhart* does not govern this action. As a court of review, however, we may consider abstention—and the full scope of arguments counseling in favor of its application—on our own volition. See *Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976); see also *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 525 (7th Cir. 2021) (explaining that "abstention doctrines do not exist 'to protect the rights of one of the parties' but instead to 'promote a harmonious federal system'" (quoting *Waldron v. McAtee*, 723 F.2d 1348, 1351 (7th Cir. 1983)). And where, as here, the views of the parties have been so fully and ably represented by talented counsel, we are comfortable reaching the

ultimate issue of whether abstention is proper and saving the threshold question about which doctrine should apply for another day.

Because we conclude that exceptional circumstances warrant federal court abstention in favor of the ongoing Texas litigation, we affirm the dismissal of Dr. Braid's complaint under the *Colorado River* doctrine.

1

*Colorado River* authorizes federal courts to defer to parallel state-court proceedings in "exceptional" cases "where abstention would promote 'wise judicial administration.'" *Antosh v. Village of Mount Pleasant*, 99 F.4th 989, 994 (7th Cir. 2024) (quoting *Colo. River*, 424 U.S. at 818). Before we can evaluate whether exceptional circumstances exist to warrant abstention, however, we must make the threshold finding that the Texas proceedings involve "substantially the same parties … contemporaneously litigating substantially the same issues," such that, under *Colorado River*, they may be considered parallel. *Tyrer v. City of South Beloit*, 456 F.3d 744, 752 (7th Cir. 2006).

We have little difficulty reaching that conclusion here. No, the federal and state-court litigation are not mirror images of one another. Only plaintiff Oscar Stilley's suit remains pending in the Texas courts (as far as we are aware), so Dr. Braid's federal interpleader action includes two additional parties not currently represented in the state-court proceedings (plaintiff Felipe Gomez and plaintiff Wolfgang Hirczy de Miño). And it is fair to say, at least generally, that interpleader might provide a more efficient remedy and get Dr. Braid the bottom-line relief he seeks in a cleaner fashion—binding all three

defendants by a single judgment declaring S.B. 8 unconstitutional.

But we do not demand "formal symmetry" between the federal and state actions, instead requiring only a "substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004) (quoting *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 695 (7th Cir. 1985)). As we have explained, "[t]he addition of a party or parties to a proceeding, by itself, does not destroy the parallel nature of state and federal proceedings." *Id.* at 686. It is sufficient in this case that the actions are substantially similar. "[T]he thrust" of the proceedings is the same here, as "they rely on the same factual predicate"—the September 2021 abortion—"to raise substantially similar legal issues"—whether S.B. 8 is enforceable—"against substantially similar parties." *Id.* at 687.

Dr. Braid disagrees and contends that the Texas proceedings are not parallel because S.B. 8 "rigs proceedings against defendants," making it impossible for him to receive a fair shake on his constitutional challenges in the Texas state courts. By way of example, he points to S.B. 8's provision barring defendants from asserting their "belief that the requirements of this subchapter are unconstitutional or were unconstitutional" as an affirmative defense. Tex. Health & Safety Code § 171.208(e)(2). But reference to this or that aspect of S.B. 8's statutory scheme does little to undermine our "assumption that state courts are co-equal to federal courts and are fully capable of respecting and protecting [a plaintiff's constitutional] rights." *J.B. v. Woodard*, 997 F.3d 714, 724 (7th Cir. 2021) (alteration in original) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1074 (7th Cir. 2018)); see also *Sawyer v.*

*Smith*, 497 U.S. 227, 241 (1990) ("State courts are coequal parts of our national judicial system and give serious attention to their responsibilities for enforcing the commands of the Constitution."). So despite Dr. Braid's assertions to the contrary, we see nothing in S.B. 8 to suggest that a Texas court could bar him from litigating the constitutionality of subsection (e)(2) or any other provision he finds problematic in response to plaintiff Stilley's Texas suit to recover damages.

To frame the question too literally and demand a perfect parallel would undermine "the more general principles of federalism that underlie all of the abstention doctrines," including *Colorado River*, namely "equity, comity, and federalism." *Courthouse News Serv.*, 908 F.3d at 1072–73 (determining that even though none of the abstention doctrines provided a "perfect fit," abstention was nevertheless proper where a news service brought a federal suit challenging the constitutionality of the clerk of the county court's process for releasing newly filed complaints to the press). Where, as here, adjudication of the federal claim "risks a serious federalism infringement," we do not demand "literal perfection." *Woodard*, 997 F.3d at 723.

2

Having concluded that the state-court proceedings are parallel to Dr. Braid's federal suit, the next step is to assess whether exceptional circumstances warrant abstention. Ten factors inform the inquiry, though "[n]ot all of these considerations will be pertinent to every case," *DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*, 953 F.3d 469, 477 (7th Cir. 2020):

> 1) whether the state has assumed jurisdiction over property; 2) the inconvenience of the

federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the order in which jurisdiction was obtained by the concurrent forums; 5) the source of governing law, state or federal; 6) the adequacy of state-court action to protect the federal plaintiff's rights; 7) the relative progress of state and federal proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the availability of removal; and 10) the vexatious or contrived nature of the federal claim.

*Tyrer*, 456 F.3d at 754 (quoting *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 701 (7th Cir. 1992)). We do not tally up those factors weighing for and against abstention in a "mechanical checklist," *Moses H. Cone*, 460 U.S. at 16, but instead make "a practical judgment informed by principles of comity, federalism, and sound judicial administration," *Driftless Area Land Conservancy*, 16 F.4th at 527 (describing the *Colorado River* abstention inquiry as "flexible").

We see several considerations weighing so heavily in favor of abstention that the impact of any factors counseling for federal retention is negligible. Foremost, not only are the Texas courts capable of resolving Dr. Braid's claims, but they are also better suited, making the federal forum inconvenient. A fundamental problem with Dr. Braid's federal interpleader claim becomes readily apparent upon considering a question at its epicenter: how is a federal court to apportion damages among multiple competing S.B. 8 claimants? As the district court underscored, the Texas legislature provided no guidance on this issue, so any decision on this important question of state law would be little more than a shot in the dark given S.B. 8's deliberate uniqueness. See *Moses H. Cone*, 460 U.S. at

26 (explaining that "in some rare circumstances the presence of state-law issues may weigh in favor" of abstention).

Taking a closer look at Dr. Braid's claims for declaratory relief, much the same problem persists, and this is true whether we proceed with a *Colorado River* analysis or under the lesser standard of *Wilton-Brillhart*. See *R.R. St. & Co.*, 569 F.3d at 717 (explaining that, where a complaint contains independent claims for declaratory and non-declaratory relief, district courts should apply *Colorado River* to the non-declaratory claims and *Wilton-Brillhart* to the declaratory ones). We see no two ways about it: his constitutional challenges would require us to interpret S.B. 8 in the first instance, defining its contours and giving shape to the limitations it imposes on civil defendants—a question governed wholly by Texas law—before we can proceed to the second step and determine whether a particular dimension of the Act violates Dr. Braid's constitutional rights. To engage in this type of detailed analysis would require a federal court to answer novel state-law questions without a fulsome understanding of Texas procedure—including, for example, Texas's application of the constitutional avoidance and severability doctrines, to name a few issues—leaving us to reason on our back foot.

Against this backdrop, the risk of intrusion on federal-state comity is substantial, and we see no sufficient countervailing concern to justify federal court intervention. To the contrary, the state courts were the first to obtain jurisdiction over this controversy when the three plaintiffs sued Dr. Braid in Texas state court. And we are confident that the state courts, and perhaps ultimately the Texas Supreme Court, are much better positioned to resolve the full range of complex questions before us about S.B. 8's permissible application in

circumstances like those pressed by Dr. Braid's multi-faceted constitutional challenge to the enactment. See *Courthouse News Serv.*, 908 F.3d at 1074 (explaining that comity rests on "the assumption that state courts … are fully capable of respecting and protecting" individual constitutional rights). It strikes us as inevitable that the Texas courts in time will all but have to supply answers given the many suits filed by non-parties challenging the constitutionality of S.B. 8 as Dr. Braid does here.

Abstention also avoids the danger of piecemeal litigation and conflicting judgments, the very problem Dr. Braid seeks to avoid. By abstaining, we protect both "the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority." *Tyrer*, 456 F.3d at 756. If, for example, plaintiff Stilley succeeds in winning a judgment against Dr. Braid in his Texas suit during the pendency of this litigation, a federal judgment for plaintiffs Gomez or Hirczy de Miño on Dr. Braid's interpleader claim would create a new dilemma to sort through: is the federal interpleader judgment enforceable in light of a conflicting state-court decision? Abstention avoids these concerns, and the other downstream issues that may arise, by the district court's exercise of jurisdiction.

Abstaining is also appropriate considering that resolution of an issue of state law may moot Dr. Braid's federal suit, thereby providing for a cleaner and more efficient resolution of this litigation. While these federal proceedings have been ongoing, a Texas trial court dismissed plaintiff Gomez's state suit against Dr. Braid because it found he lacked standing under the Texas Constitution. The Texas Court of Appeals affirmed, stopping short of examining the merits of that

conclusion. See *Gomez v. Braid*, No. 04-22-00829-CV, 2024 WL 697105 at *3 n.4 (Tex. Ct. App. Feb. 21, 2024). It stands to reason, then, that if a Texas court concludes that S.B. 8's citizen-suit provision falters under the Texas Constitution, there would be no need for any court, state or federal, to supply answers under the U.S. Constitution.

As a final note, and to state the obvious, this lawsuit reflects an element of forum-shopping. Dr. Braid, a Texas physician, has asked a federal court in Illinois to adjudicate his liability and pass upon the constitutionality of a Texas law, in part, to avoid resolving those same issues in the state-court system, which he characterizes as rigged against him. We offer this observation not as a criticism, for there is no question S.B. 8 has put Dr. Braid in a difficult predicament. Our more limited observation is only to underscore that abstention is particularly appropriate in a case like this one where we see no connection between the subject matter of the controversy and the federal venue sought. In the end, because Dr. Braid's federal claim would require the district court to wade into complex and unsettled questions of state law (with difficult federal constitutional claims waiting in the wings), and thereby disregard the existence of parallel state proceedings capable of providing the answers, we find that exceptional circumstances exist which warrant abstention under *Colorado River*.

## IV

We thank counsel on both sides for their exceptional advocacy in the face of challenging legal issues and offer our special gratitude to Brian J. Paul of Faegre Drinker Biddle & Reath LLP who took on this assignment as a friend of the court.

For the reasons explained, even though we conclude that the district court possessed jurisdiction over Dr. Braid's interpleader action, we AFFIRM the district court's judgment because this case belongs in the Texas courts.